And we'll hear argument next in Richards v. City of Seattle, and I gather it's the same cast of lawyers in both cases. Give us just a moment. Now, we didn't get to it in the prior case, but there is a common issue with respect to joinder. Do you want to say anything about that on the assumption that we would reach that stage? Yes, thank you. The joinder issue is one that ought not be a difficult one. It's just factually a little difficult here, and that is that they didn't file their lawsuits at the same time. Mr. Richards filed his lawsuit after he found that he was going to be suspended. So from the trial court's perspective, the first motion is made after that time. So we have common issues. We have the second fact pattern coming into play, which is the 2007 demotion and suspension. And then in the fall of 2007, the plaintiffs in both cases file motions to consolidate the two cases and, again, are denied. It seems that just looking at how the evidence overlaps, that if this case is remanded, it would be a tremendous burden on everybody to have to go to two juries. Just to clarify then, the issue only arises if the case is going to go to trial. Otherwise, it doesn't matter. That is true. That is true. It only matters if it goes to trial. Counsel. Yes, Your Honor. I've asked a few questions about the record, and really the trial judge blamed you. Yes, he did. And I had the same trouble he did. And we've got authority out there that says it's incumbent upon the party opposing summary judgment to have the evidence that shows a genuine issue in the opposition and to provide the judge with page numbers and sufficient guidance so that he can, as a practical matter, find it. I'm troubled that we're sort of relegated to deal with a lot of rhetoric because we can't find stuff. And it seems like it's your fault, and the authority supports the trial judge, and neither he nor we have to just search this whole mountain. Well, certainly my apologies to the court. And to the extent that you blame anybody, you should blame me, but please don't hold it against my client. Well, it's not a matter of holding it against them. It's not a matter of punishing somebody. It's a matter of if you want to show a genuine issue of fact, you have to hold it up and show it. You can't just say, look in that several banker's boxes full of papers and you'll find it. Certainly. And I totally agree, Your Honor. If you look at the oral argument that surrounded this case as well as the Davis case, in fact, the issues that are being discussed here were discussed there. And the briefing actually did do that. And frankly, the Carmen v. San Francisco case that's cited in the court's order where he does criticize our package, that case dealt with a two-year-old fact statement that arguably could have gotten over summary judgment that wasn't brought to the trial court's attention as part of summary judgment. But that holding does say that you still have to look at what's in the summary judgment package. There's a subsequent case that goes a little further with it. Yes. Maybe. Maybe there is. But if I may address what — In regards to Mr. Richards, the issues are really much simpler because we only have the one incident, and it's a harassment claim. He was not, as I understand it, he filed his lawsuit after the investigation was launched but before the discipline occurred with regard — Before the actual discipline, yes. Right. But the recommended discipline. Yes. It was already a recommended discipline. Yes. That's my understanding. When did he file the charge, though? Yes. We have to wait 60 days because of the administrative claim and all that. But he filed the charge. What's the status of things when he filed the charge? Yes. He filed the administrative charge. You mean? When? After or before? With relationship to the disciplinary proceeding. It was after the recommendation. He wasn't disciplined until July of 07. Right. And the discipline, unlike Ms. Davis's demotion, was a five-day — Suspension. Suspension. Yes. Did that have consequences with regard to promotions or out of class or anything else? Well, it did because they implemented a new policy that basically says that — But what about Ms. Davis's earlier one, which I'm told didn't have such a policy? No, they actually did because if you look at the testimony that we cited, Ms. Andrade's deposition, she says that there was precedent for not permitting people to go for promotion after they've been disciplined. And she cites a name that I don't have right here. And then she says that was the first person. And the second person was Wanda Davis. So Andrade is saying that that's the policy that was in place. But the whole — but our position is that's a question of fact for the jury because there is no written policy. It's the idea that they met. And this is Ms. Andrade saying that. What is the claim? Because you haven't talked about it in either context with regard to the second discipline. Now, I will tell you going in that it sounds much more justified to me than the first one and, therefore, much less likely to be projectual. Right. And it's real important that the court view this all in the light most favorable to the plaintiff because if a layperson heard, oh, a guy came in on site and he climbed onto a structure, oh, my goodness, that must be bad. But you have to put yourself in the shoes of these professional people who are there every day. They take their kids into that place and they put them in bucket trucks and they let them sit behind machinery and they let the Seattle attorney come in without the proper footwear. Bucket truck, by the way. I'm sorry? It's a bucket truck. A bucket truck. We call them cherry pickers when I was a kid. It's two big arms that go up and there's a bucket up on top. So it's for elevating you several maybe 20, 30 feet above the ground. This had the additional element of trying to help a sure-tail relative or prospective sure-tail relative have an advantage on the exam, as I recall. But that would be in the light most favorable to the city, though, because in the light most favorable to us it was simply a recruiting effort. The light most favorable doctrine, you correctly state the words, but I don't think it means we have to read everything on the assumption that it's discrimination because of sexual orientation. It just means that when there are differences in the facts and the reasonable inferences that can be drawn from them to determine whether there's a genuine issue, we read it in favor of the opponent of summary judgment. And here, frankly, it sounds kind of shocking to me. And letting an unauthorized person into the substation and letting them do a dangerous thing while he's there and letting them do these things for the motive of helping them on a test. I mean, I would think regardless of what sex or color or sexual orientation or anything else, an employer would say, my gosh, we could really, if he'd fallen off the pole, be all over the front page of the paper. I understand your position, but, Your Honor, keep in mind that our position is twofold here. First, we say they did nothing wrong. These two individuals, Wanda Davis and Ed Richards, under the policy, the written policy in place at the time, they had the authority to allow people to come on to the site. There had been, and it's in the record also, there had been a big recruiting effort to bring people in. This fellow, he was a person who was in the apprenticeship program and trying to decide if he wanted to go forward. They basically brought him in on... He was applying to be in the apprenticeship program. Yeah, he was a candidate. He had completed the written test, was going for the working test. There's no, even this is what's so important, is that if you look at that investigation, there is all these allegations. First, they violated the union contract. They had violated administrative codes. All of these things... Is your claim that they didn't violate it or everybody violated it? No, the claim is that they did not violate it. She and he had the right to authorize people to come on. Nettie Doakes' declaration... I don't understand the least of it. The problem is that they, after he came on, and I'm going to put the ethics issues aside also, but in terms of danger, they had this guy climbing, like, what, 20 feet up with a harness on and so on. That seems... It's actually what you do to recruit. If Nettie Doakes' declaration... Say that again. Say again. Yes, if you look at Nettie Doakes' declaration submitted by the other side, they actually have a different location where they let applicants come on board and climb these towers. There is nothing wrong about what they did, only how it was interpreted because it was Rhonda Davis. Different location. Say again. A different location where they let them climb these towers. Let them climb towers, Nettie Doakes said. Under some sort of safety supervision or protection. Well, Heimgardner's deposition, he admits that these guys were qualified to let an applicant go up there. The only thing he says is, you should have asked. And I asked him, who did she need to get permission from? And the answer was, I don't know. It wasn't in writing. Then he guessed maybe Nettie Doakes. There was no written policy and procedure that prohibited them from doing what they did. It's okay for them to climb. Why didn't he go to the different location? Why don't they send them there? Because he knew Rhonda Davis. Rhonda Davis was... He was a fiancé of her daughter. But there's no evidence that she did anything unethical. The ethics portion, when you read the report, it goes nowhere. But the important thing that's odd about what happened in this investigation is, remember, again, her immediate supervisor... To me, it sounds like what people are always accusing firemen of, helping their cousin get a job in the fire department in the good old boys' network by telling them the test answers. Your Honor, I agree with you. Had there been any evidence of what they said she did, I wouldn't be representing her. But there's no evidence that she did anything to help him do better on the test. In fact, he failed the test. Was Weintraub out of the picture by then? Weintraub was not out of the picture. He was working for Heimgartner at the time, and Heimgartner's the guy who... He writes the first layer of disciplinary recommendation that ultimately... But he didn't have anything... Did he have anything to do with either the investigation or the ultimate decision? No, he's not involved like he is in the other things. He was hired by the time of Carrasco's decision. I agree. I think so. Yeah. I think the testimony we had as to his link was that he was simply, again, an advisor to Heimgartner by this time and that he worked on discipline letters, and Heimgartner writes the discipline letter that Carrasco finally adopts. But that is it. So then we have a complete outsider doing the investigation, and there isn't this infection problem with regard to Weingartner's... Yes, there is, because that whole package is given to Knerk. So Knerk... They don't just let Knerk go do her thing on this. They give her all of the background material. As a matter of fact, one of the positions we had was that, look, Carol Gerdes wrote way back when regarding the first investigation. She complained about this Bill Ivey guy going, basically in sort of a sexual harassment way, not listening to her when she's doing her work and calling a civilian from off-site to come in and look at her work and give a second opinion. And that fellow comes on to what is basically the same thing, a substation, does the same thing, it touches material, and he's told he's doing... He's climbing up 20 feet into the air. Well, see, but that's only because we're lay people. That's what these people do for a living. They climb up, they climb down. You don't want somebody who's going to be an apprentice going into that business if they can't stand 10 feet above the ground when they're properly harnessed in. Not a good argument. The whole point is we have no idea whether that guy can climb. He didn't become an apprentice. He, in fact, failed the test in the long run. Right. So the fact that somebody thought he was dangerous certainly has some credibility. Well, not really. Your Honor, if you look at the facts, they did what they were authorized to do. They did the same thing, you know, like I said, if you look at the list of things where people come on to the station and do things, little kids go up in bucket trucks, as I've said. Bucket trucks are different from climbing a pole. I mean, I see those around town all the time. The idea is it's a safe way to get up high. A lot easier and safer than a ladder. Well, and one could certainly argue that, but the bottom line is here's a guy who's applying for the very job. You stand in a truck and it raises you up in a bucket. Sure. It would be hard to even fall out. Well, I don't actually know whether it would be enough, but I do know that in this particular setting, and in the lightness fair rule to the plaintiff, this was simply a recruiting effort and they did nothing wrong. If they did do something wrong, our backup argument is, boy, they sure were disciplined. Why isn't it a recruiting effort? Well, I mean, I'm sorry. Sorry, go ahead. Go ahead. In the sense that helping somebody cheat on a test by giving them the answers in advance would be a recruiting effort. Well, that would be cheating, but there's no evidence that anything like that happened in this case. Why isn't this cheating? Because all they were doing was the same thing that they could have done, according to Nettie Doves, anywhere. It's the same thing that there's a job shadow guy who submitted a declaration that we mentioned in our brief. He does the same thing. He basically comes in and, do I want to do the job? They rope him up and he climbs up. It's what you do to try to recruit people. But this is the thing. Davis was demoted for, I mean, she lost big time over this, but your guy, your current guy, was suspended for five days. Right. And ultimately this has to somehow support free text, which means that it has to smell so bad that you start to believe it was done for some other reason. How does it meet that standard? Well, why would Heimgartner threaten them with retaliation after they came to him and said, They had found Kimberly West had actually come to them upset, saying, hey, I didn't say what it says I said in this report. And when they went and reported that to Heimgartner, a direct report to Carrasco, they were threatened with retaliation. They weren't allowed to present their full case to Carrasco. Carrasco actually manipulated who, in the follow-up investigation, who would be interviewed, didn't interview their people, interviewed selective crew chiefs. Your Honor, I don't think we have to say straight pretext here. I mean, that's one of the ways to prove it. Carrasco pulled his hand away when Ed Rich's partner offered it to Shake after he introduced him as a partner. Carrasco, we have direct evidence of Carrasco's animus towards gays. Carrasco said to the Something bad has to be done as a result of the animus. I imagine, oh, often when women get divorces, they don't like men for a while afterwards. Well, that's not a Title VII violation. No. Even if they're supervisors, it's not a Title VII violation. Until they actually do something discriminatory, it isn't a Title VII violation not to like them. Carrasco suspended him for five days and then adopted this idea that he can't be promoted for a year. And, again, if you look at Joe Simpson's declaration, he says that as the union manager, he says that that is the first time it's being used against them to the extent the city says there were two people it was used against before. They're managers, and we can't tell if they're gay or not because the judge below said that we're not allowed to ask the city who's openly gay. So we think we have a very strong case on this one. Thank you, Counsel. Your time has expired. We'll hear from the city. Thank you, Your Honors. Let me start off by responding to the issue about the promotional opportunities and out-of-class because I think there is evidence that's undisputed in the record that it was not selectively applied. Ms. Andrade testified at her deposition and is part of the record in the briefing that two people, one male, one female, were subject to the same application, and it really is one of common sense. You don't suspend somebody or, in Ms. Davis' case, demote someone and then turn around and reward them with a promotion, whether it's a temporary out-of-class promotion or a long-term promotion like supervising. Well, that makes more sense with regard to a demotion for a year, but a five-year suspension, a five-week day suspension, you can certainly say, you know, it's a five-day suspension. You take it into account in the promotion, but you don't. I mean, in other words, it's not given. And one thing that is disturbing is that you'd think if this was really a policy, there would be more than two people to whom it was applied to because there certainly wasn't two people who had been disciplined over the past several years, I assume. Well, I think you would need the record to show that those people had been disciplined and then had made application for promotional opportunities and then didn't get them. And so we don't have that evidence. I mean, I think that's the plaintiff's obligation to bring that evidence to the court. But your witness only pointed to two instances, only two instances. That's correct. She refers to Mr. Johnson and Ms. Chetland. And there's a third thought, too. You mean the only two instances in which people applied so it didn't come up, is that what you're saying? Those are the two that we found that we're aware of, and there could have been more. I don't know. I don't know how often people get suspended. Has anyone pointed to instances where they were suspended and nevertheless promoted? There's no record of that. And, you know, hopefully that isn't the case. Hopefully we don't have a lot of suspensions for safety violations or serious suspensions. Actually, I thought you had a record of 15 of them or so. That's what you're aware of. Well, Mr. Simpson provided copies of disciplinary letters that went out for union members. I think what counsel is pointing out is that Mr. Simpson's expertise lies in the area of people who are represented, whereas the city had people who were in management positions, more like Ms. Davis and Mr. Richards perhaps, who wanted to be promoted. And in their case, one of them had been Ms. Chetland and Mr. Johnson. No, Ms. Davis and Mr. Richards. Yes, that's correct. So they weren't managerial in that sense. Well, we contend that a crew chief has supervisory responsibilities. In terms of the distinction you just made, they're on the other side of it. They are union representatives. Yes, that is correct. That is correct. I was simply pointing out that Seattle City Light has applied the policy to others, that there was evidence of that in the record, and that these were not the first two individuals who were subject to that. And, in fact, we had a declaration from Mr. Burl Hardy, who was the city's labor negotiator, who says they started putting the notice in so there would be no confusion in the future. There was another gentleman, Mr. Kefkin, who also lost out on promotional opportunities. He was suspended for one day, and he was not considered for promotion because of his one-day suspension. So I don't think it is fair or accurate to say that this policy was selectively applied only to the two plaintiffs, Davis and Richards. That's not accurate. Moving along to what has been called a recruiting effort, I think one of the things that is very clear in the declarations, for example, he kept referring to the declaration of Nettie Doakes. She is someone who is charged with implementing a program for bringing people into the utility, bringing people into the trades. And while it might be true that the city wants to attract people who are interested in this career, there are ways in which that is done. And what Ms. Doakes has supplied is the way in which that is done. There is a structure that is away from energized wire. It is not in a substation where this took place with Mr. Duvall, and that is where people are taken with knowledge of management and are allowed to climb structures so that they can get practice. Oh, you mean this pole that they let them climb isn't near a wire with electricity in it? Right. That's correct. It's a completely separate location. Davis and Richards let the prospective Shurtale relative climb, was near a wire with electricity in it? It was square in the middle of a substation, which if you drive past it on 4th Avenue south towards Costco, it is full of energized lines. We're not contending that it had them climb an energized line, but merely in the vicinity. And it is an inherently dangerous workplace because of that. And that is why Ms. Doakes says there is a way in which we do this, and we take them to this facility, and this is where they practice this skill. And I think it's true that there are ways in which people are allowed to train and get the competencies they need to practice, but it isn't to contact a family friend and go out to the substation for a day. And the suggestion that people, that their children do things that are equally dangerous is not well taken. He's talking about Take Your Child to Work Day, where there are sponsored events, where people help children in little bucket trucks, and we don't think that's at all sane. Little bucket trucks and mini special bucket trucks? I don't think they have special bucket trucks. I think they are the same. Little of them. They're not the regular bucket trucks? I think they actually think they probably are the regular bucket trucks. Can the kids see over the top of the bucket? You know, it depends on the age. Some of them are quite small, so I don't know. So they're not saying that people that work in substations just routinely bring their kids into the substations, let them fool around, ride the bucket trucks? They're saying Take Your Child to Work Day is kind of like when the fire department pulls a fire truck up in a park and lets little kids clamber over? It is. It's a sponsored day where there are specific events and activities planned for the children who come to work. It is not management's position that it's okay to bring your children in any time you choose and let them climb around on the equipment. That's not allowed. So, yes, it's more like the fire department. Is there evidence that the kids are routinely allowed into the substations to mess around? No. Counsel is correct in stating that Mr. Weintraub had nothing to do with the investigative findings in this case. His role was one of executive assistant. He took no part in the decision-making process. We don't know that Weintraub had anything against Richards. We know he had something against Davis. Okay. What about this notion that they had authority, that somebody had authority to allow them to do this and they had the authority, or at least they didn't know who they were supposed to ask? Who they were supposed to ask to bring someone into the station? I mean, she at least was a fairly senior person, right, with regard to the substation. I wouldn't agree with that assessment. The level is journey worker, crew chief, and then there's a level above that. What the rule that they've quoted says is if the operator is away from the station, then, you know, on a temporary basis, crew chief's in charge. And she's using that to say, well, since I'm the one in charge, I have the authority to authorize this. I think that's a stretch of the regulations and the policy, and it certainly is not a practice that people are allowed to bring family members in to practice climbing around on the poles. So I think that's a very broad reading of the regulation that they're citing. And I think more to the point, what is really at issue here is a question of judgment. These people used their judgment, unfortunately, in a way that was not in the best interest of the other people they were supposed to be supervising. I mean, there are serious safety risks connected with just bringing someone there. If he had fallen and somebody had to rush to help him and fell off their own structure, I mean, this presents a safety risk to everybody there, not just to the person who came in and wasn't fully trained. So I don't think they have the authority under that code to subject the utility to that kind of risk. And that's really a more general and legal and abstract question. There's a lot of discussion in the briefs about the hearsay rulings that Judge Zilley made with regard to – and our case law, as far as I can tell, is completely contradictory on this subject. On the one hand, it says you can't have any visible evidence supporting summary judgment. On the other hand, there are statements in various cases that say that it's okay to introduce hearsay in support of your position in summary judgment because you could subpoena the actual speaker at a trial. So which is it, and what are we supposed to do with this? I think I have read the cases more to suggest that if you could lay a foundation for them, then they could be admissible pieces of evidence. But let's say, for example, let's – Well, if you could lay the foundation for why somebody is acting within the scope of their employment when they make that statement. But there are other cases that say even if it is hearsay, even if it's not within a hearsay exception, that it's okay in summary judgment as long as you could introduce the actual – because the inference seems to be that you could get the actual speaker to speak at a trial. I mean, that's a little – there are flat statements. Right, I understand what you're saying, and I think it's really specific to the kind of statement at issue, to be fair. I mean, it's one thing to say this is what this person says about it being inherently dangerous. You know, maybe that is hearsay, and if they came to trial, they'd be allowed to testify to that. But it's another thing entirely to say, well, unknown declarants said to Patty Eng that they'll never promote a woman who is a lesbian to be a supervisor because we don't know who the unknown declarant is, so we can't – I have to add it with regard to – you're certainly right with regard to unknown declarants, but some of them were known declarants, I think. Is there one in particular? I can't remember, but I read through the – Okay. The Eng one, I understand, was an unknown declarant, and knowing that, she's dead, so how are we going to find and declare it? But there seemed to be some which were – you know, you said so-and-so said it. So-and-so. Well, like the one for Carrasco, where Carrasco supposedly said whatever he said about the gay pride parade. We know who said he said it, and she said that he said it in her presence. Correct. So our plaintiff is saying that she, he, or she spoke to this person who heard Harry Carrasco say this thing, and so you're saying that even if – if we take the cases that say that could maybe come in at trial, let's say he can establish under 805 that they're both exceptions to the hearsay rule, one's a statement of party and the other one comes in for no reason. That's one possibility. But I'm saying we have case law that seems to say as long as we know that Carrasco exists and he could be subpoenaed. Right. That's – then the fact that it's hearsay, that the person who submits the declaration is submitting it as hearsay doesn't matter. Okay. So the court made an error in not considering the evidence perhaps of that statement. I'm not even saying that because I think our case law goes off in two directions. Right. But there is some case supporting it. So suppose that were true. So suppose that the trial court here made a mistake. He should have considered that particular statement. He didn't. He set it aside. He said it's an admissible hearsay. I think our – I think I'm back to saying to the court, well, with all respect, that is an incredibly weak piece of evidence to get us to that connection, and that's really what our whole summary judgment was about. What is the connection between orientation? What is the connection between gender in Ms. Davis' case, and what is the connection with the prior productive activity? And I don't think that that one statement in and of itself is that little scintilla of evidence that gets you over that hump, because let's not forget, both our state Supreme Court and our U.S. Supreme Court have said that you can have still a weak piece of evidence, plus a prima facie case, and if there's overwhelming evidence, as we believe there is in regard to the discipline, to support the decision that was made in nondiscriminatory reason, here, safety, then that is not enough to get past summary judgment. And we respectfully ask that you affirm the trial court, and I will defer to co-counsel. I just want to pick up. Would you introduce yourself for the record, please? Yes, David Bruce, still representing Jorge Carrasco in this Richards matter, as well. Thank you. What the city just argued is, I believe, absolutely correct, and it's acutely focused here with respect to Mr. Carrasco and Mr. Richards. The Hill case, which is cited in the briefing, and cites in turn the Reeves case, the U.S. Supreme Court case, these cases do stand for the proposition that where there's a weak prima facie case, a strong justification for the action that the employer took, and weak or nonexistent evidence of pretext, the case doesn't have to go to the jury. Counsel, do you want to say something about Mr. Carrasco? I believe it was Mr. Carrasco who had the incident with withdrawing the handshake. Yes, I do. And also the comment about nudity at the parade, the gay pride parade. I absolutely do. That's exactly where I'm heading. Just a brief predicate, though. Here we do have a very weak prima facie case, so much so that Judge Zille expressly held as to this suspension of Richards that there was no prima facie case. So at least one judge thinks that. We have what I think is demonstrably a strong justification for the discipline. So we're left with what is, I think, very weak. And a relatively minor discipline. And a relatively minor discipline, yes. I mean, look, it's still serious. It's a five-day suspension. I don't mean to denigrate it, but it's not a demotion. It's not getting fired. It's not the end of the world. Be sure to get to Judge O'Scanlan's question. Yes, I will. So what we have are two pieces of evidence about the alleged pretext. One is Mr. Carrasco is supposed to have failed to shake the hand of Mr. Richards' partner at some social event. The record demonstrates that at the time Mr. Carrasco did not know that Mr. Richards was gay. I thought that what he said was, here's my partner. That's correct. So if he didn't know before, he knew then. I suppose. Although, frankly, even that is not unambiguous. I myself occasionally introduce my partner, who happens to be my business partner. Now, that obviously wouldn't be so here. But even that is not unambiguous. And I'd suggest that the not shaking the hand also is not unambiguous. I don't think it tells us enough to go to the jury. Same thing with the statements that Mr. Carrasco is alleged to have made with respect to the gay pride parade. Statements themselves are, as I understand it, do they really celebrate this in Seattle? Question. And will they be naked in the parade? I'd submit that those statements also are not unambiguous. They are questions. The question about nudity actually strikes me as an appropriate concern for somebody to have when they're considering whether or not, you know, city light equipment is going to be used in a public event. And the other might merely evince curiosity. So I think what you have is ambiguous evidence at best, even if it's admissible. And, of course, I think there is a strong evidentiary argument that those statements, those hearsay statements don't come in. And I believe Rule 56. They're not really actually hearsay, are they? Sure they are. They're not hearsay from Mr. Carrasco because they're not submitted for the truth. They weren't reported by the woman who reported them because they weren't reported for the truth of anything. But there's no declaration from her. So what she's saying is hearsay. So how does it come in then? It doesn't. I mean, how was it introduced? Well, it was offered by Mr. Richards saying she said. I see. So she said it to him and he said somebody else said it to him. Yeah, it's actually, I mean, we initially carried it. Thank you, counsel. Your time has expired. The case just argued will be submitted and the court will adjourn. Hear ye, hear ye. All persons having had business with the honorable judges of the United States Court of Appeals for the Ninth Circuit will now depart. The court for this session now stands adjourned.
judges: O'scannlain, Kleinfeld, Berzon